[S. F. No. 11291. In Bank.—November 10, 1926.]

In the Matter of the Estate of BETTIE ROSS, Deceased. JAMES MARCO GORMAN, Respondent, v. ELLA TAYLOR, Appellant.

[1] ESTATES OF DECEASED PERSONS — WILLS — CREDIBILITY OF WITNESSES—FINDINGS—APPEAL.—It is the exclusive function of the trial court to judge the credibility of the witnesses, and where it finds upon conflicting evidence that the will of a decedent was not destroyed on a certain date, the finding is conclusive on appeal.

[2] ID.—REVOCATION OF WILL—DESTRUCTION OF WILL—PRESUMPTION OF INTENT.—Where it was established beyond question that the will of a decedent was last seen and known to have been in her possession on a certain date, that from that date until the day of her death she was in the possession of her physical and mental faculties and that the will could not be found after her death, from these facts the presumption arises that the will was destroyed by the testatrix with the intention of revoking the same.

[3] ID.—PRESUMPTION OF REVOCATION—WHEN OVERCOME.—The presumption of revocation of a will does not apply, or is overcome and rebutted, where it appears that the will was deposited by the deceased with a custodian and that the deceased did not thereafter have it in her possession or have access to it.

---

1. See 2 Cal. Jur. 921.

2. Presumptions as to revocation of missing will, notes, 50 L. R. A. (N. S.) 864; 38 L. R. A. 433. See, also, 26 Cal. Jur. 807; 28 R. C. L. 384.

3. See 26 Cal. Jur. 808; 28 R. C. L. 385.

[4] Id.—Special Presumption of Revocation—General Presumption of Section 1963, Code of Civil Procedure.—Where the special presumption of revocation of a will is applicable to the facts, it is not rebutted or overthrown by the application of the general presumption embodied in subdivision 32 of section 1963 of the Code of Civil Procedure, that a thing once proved to exist continues so long as is usual with things of that nature.

[5] Id.—Destruction of Will—Fraud—Insufficiency of Evidence. In this will contest it is held that the evidence was insufficient to justify the finding of fraud necessarily implied in the finding that the will of the deceased was destroyed after her death.

[6] Id.—Will Contest—Rules and Weight of Evidence.—The rules of evidence and the weight to be accorded to the evidence are the same in a will contest as in any other civil case.

[7] Id.—Fraud—Evidence—Inferences.—While the trial court is the exclusive judge of the weight to be given to the evidence, there is a presumption in favor of honesty and fair dealing and there must be facts and circumstances in evidence from which the trial court can draw inferences of fraud, the burden of proof of which by substantial evidence is upon the party asserting the fraud.

---

(1) 4 C. J., p. 844, n. 66, p. 883, n. 33, p. 885, n. 39; 40 **Cyc.,** p. 1359, n. 76 New.   (2) 40 **Cyc.,** p. 1280, n. 2.   (3) 40 **Cyc.,** p. 1281, n. 3.   (4) 40 **Cyc.,** p. 1280, n. 2.   (5) 40 Cyc., p. 1285, n. 27 New. (6) 40 **Cyc.,** p. 1285, n. 27 New.   (7) 4 C. J., p. 844, n. 66; 22 **C. J.,** p. 147, n. 53, 54; 23 **C. J.,** p. 16, n. 81; 27 **C. J.,** p. 44, n. 57, p. 66, n. 13, p. 67, n. 14.

APPEAL from an order of the Superior Court of Santa Clara County admitting to probate a lost or destroyed will. P. F. Gosbey, Judge. Reversed.

The facts are stated in the opinion of the court.

H. A. Blanchard for Appellant.

Ward Sullivan, James L. Atteridge and Charles M. Cassin, Jr., for Respondent.

SHENK, J.—This is an appeal from an order admitting to probate an alleged lost or destroyed will. Mrs. Bettie

---

6. See 26 Cal. Jur. 1098.
7. See 12 Cal. Jur. 817; 12 R. C. L. 424.

Ross died on the eighteenth day of June, 1923, in the county of Santa Clara, at the age of seventy-two years. She died childless, without father or mother living, and her next of kin and heirs at law are James Marco Gorman, a nephew; Mrs. Ella Taylor, a sister; John Butterfield, a brother, and G. B. Palmer, L. C. Palmer, D. B. Palmer and Carrie Palmer Noble, the children of a deceased sister. The deceased left an estate in said county of the approximate value of $95,000, consisting of a house and lot at No. 493 South Thirteenth Street, in the city of San Jose, of the value of $8,500, the balance being principally money in bank. On July 6, 1923, the said James Marco Gorman, who will be referred to herein as the proponent, filed a petition for letters testamentary, in which he alleged, in addition to the jurisdictional facts, that the deceased made a will bearing date June 20, 1920, which was her last will, was unrevoked, and was in the possession of the deceased at the time of her death; that said will had disappeared from among her papers after her death, could not be found. and was therefore a lost or destroyed will. The petition then set forth the names and addresses of the sole devisees and legatees under said will and prayed that the same be established as a lost or destroyed will and be admitted to probate.

On July 9, 1923, the said Ella Taylor filed her answer and grounds of opposition and contest, wherein she denied that the deceased left a last will bearing date the twentieth day of June, 1920, or any other date; denied that the alleged will was in the possession of the deceased at the time of her death; denied that the alleged will disappeared from the papers of the deceased after her death; denied that it was a lost or destroyed will, and alleged that the said will was destroyed by the deceased in July, 1920, with the intent and for the purpose of revoking the same, and that the said Bettie Ross died intestate. The contestant prayed that the court adjudge and decree that said alleged will was not and is not the last will and testament of the deceased, and that the same was revoked by the decedent in July, 1920, and that it be denied probate. The proponent filed an answer to the grounds of opposition and contest, wherein he denied that the said alleged will had been destroyed or revoked in July, 1920, or at any other time, and denied that the said deceased died intestate.

With the issues as thus framed the court tried the matter and found from the testimony of two witnesses who had read said will, and who clearly recalled the provisions of the same, that the deceased had made and executed her last will and testament on June 23, 1920. The will is set forth *in haec verba* in the findings. It is therein provided that the proponent receive two and one-half acres of land and the improvements thereon at Los Gatos (which was sold before the death of the testatrix) and $42,967.83 in cash; that Peter Bennett receive $29,077.82 in cash, and in case of his death before the death of deceased the same to go to the proponent; that Ella Taylor receive the sum of $5,600 and John Butterfield the sum of $6,922.29. The residue of the estate was left to all of the beneficiaries, share and share alike. The will provided that in the event of the death of Ella Taylor before the death of the deceased the bequest to her go to Zack Taylor, her son, a nephew of deceased, and in the event of the death of the proponent before the death of deceased the portion of the estate left to him should go to his issue. The court further found that it was not true that Bettie Ross destroyed said will in July, 1920, with the intent to revoke the same, or at all, and that after the death of deceased said will, after diligent search, could not be found. The court concluded that the said will was entitled to probate and made the order from which this appeal is taken. The record is presented in a bill of exceptions.

The contestant specifies some twenty-seven grounds for reversal, but the one of major importance is that the evidence is insufficient to justify the further finding and conclusion of the court "that it has been proved and established that the said will was in existence at the time of her death, on the 18th day of June, 1923, and that the same has been lost or destroyed since her said death." It is the contestant's contention that the evidence is entirely insufficient to overthrow the presumption that the will, last seen and known to have been in the possession of the deceased, and which could not be found after her death, was destroyed by her with the intention of revoking the same. It is also contended that the evidence is insufficient to meet the prohibition contained in section 1339 of the Code of Civil Procedure, as follows: "No will shall be proved as a lost or destroyed will unless the same is proved to have

been in existence at the time of the death of the testator, or is shown to have been fraudulently or by public calamity destroyed in the lifetime of the testator, without his knowledge, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses; . . ."

There is, concededly, no proof that the will was destroyed during the lifetime of the testatrix, either fraudulently or by public calamity. Nor is it contended by the contestant that the provisions of the will were not clearly and distinctly proved by the testimony of at least two witnesses, as required by said section 1339. That the testatrix was competent to make the will and that the same was duly executed by her on June 23, 1920, is not questioned.

On behalf of the proponent it was in evidence by the testimony of Mr. Leo B. Archer, the attorney who drew the will and witnessed its execution, that the will was in existence in September or November, 1922. This witness saw the original will at that time in the possession of Mrs. Ross and examined the same. It was also in evidence by the testimony of Mrs. Lucia Gorman, the wife of the proponent, that the will was in existence on the nineteenth day of April, 1923. This witness was visiting the deceased at the latter's home in 493 South Thirteenth Street, in San Jose, on that date, and there saw the will among the deceased's private papers, which were located in a sideboard drawer in said home. It was also in evidence that the deceased had stated at numerous times after July, 1920, but not later than April 19, 1923, that she had made the will. She stated to Dr. Ada Scott Martin, in June, 1922, that she had made a will and that James Marco Gorman, the father of the baby then in her presence, was to have everything she had worth while.

On behalf of the contestant it was in evidence by the testimony of Zack Taylor that in July, 1920, at her then Los Gatos home, the deceased tore said will into pieces and directed the witness to take the torn pieces and place them upon a fire then burning in the back yard, saying to him at the time: "Marco Gorman and his wife will never spend any of my money, the way he has talked to me. Take this [the will] out; I have torn it up, take it out and throw it on the fire, and that will be the end of it," and that the witness did as he was directed. It was also in evidence

by the testimony of many witnesses that the deceased on many occasions had stated, as late as May 13, 1923, that she had destroyed the will.

[1] It was, of course, the exclusive function of the trial court to be the judge of the credibility of the witnesses. In exercising that power the court concluded, by necessary implication from the findings of fact that were made, that the testimony of the witnesses for the contestant to the effect that the deceased had destroyed the will in July, 1920, was untrue. The court accepted as true the testimony of the witnesses for the proponent that the will was in existence in September or November, 1922, and was seen and known to be in existence and in the possession of the deceased at her home in April, 1923. The only way by which the sharply conflicting evidence might be harmonized consistently with the truthfulness of all the witnesses is, as counsel for contestant suggests, by the due consideration of the undisputed evidence that when the will was prepared for execution in Mr. Archer's office both an original and a carbon typewritten copy were prepared; that the original was signed by the testatrix, the names were filled in on the carbon copy by Mr. Archer and at the request of Mrs. Ross both the original and the carbon copy were delivered to her. Therefore, it is suggested, the deceased may have destroyed the one and retained the other. But we are not concerned with that question. We are bound by the finding of the court on the conflicting evidence presented to it. It will therefore be assumed for the purposes of further discussion that all question of the alleged destruction of the will in July, 1920, has been eliminated from the case. Of paramount importance it is then to determine whether the evidence was sufficient to support the finding that the will was in existence on the death of the deceased, as required by said section 339. [2] It was established beyond question that the will was last seen and known to have been in the possession of the deceased on April 19, 1923; that from that date until the day of her death she was in the possession of her physical and mental faculties and that the will could not be found after her death. From these facts the presumption arises that the will was destroyed by the testatrix with the intention of revoking the same. (*Estate of Johnston*, 188 Cal. 336 [206 Pac. 628]; *Estate of Sweetman*, 185 Cal. 27 [195 Pac. 918]; *Griffith* v. *Higinbotom*,

262 Ill. 126 [Ann. Cas. 1915B, 250, 104 N. E. 233]; see note 50, L. R. A. (N. S.), p. 854.) The proponent places great reliance on the *Estate of Sweetman, supra,* as supporting his contention that the evidence was sufficient to support the finding that the will was in existence at the time of the death of deceased. But we do not deem that case controlling—first, because the facts were not the same, particularly in that all of the factors giving rise to the presumption of revocation were not there present. It appeared in that case that the testatrix on her deathbed had stated that about two and one-half months theretofore she had delivered the alleged lost or destroyed will into the hands of a third party with instructions to place the same in a safe for safekeeping. In the absence of a showing of some other disposition of the will prior to death, and it was there declared that there was none, it was held that the presumption of revocation did not apply and that the presumption announced in subdivision 32 of section 1963 of the Code of Civil Procedure should be applied. That presumption is: "That a thing once proved to exist continues so long as is usual with things of that nature." [3] We are in accord with the rule which seems to have been approved in that case, that the presumption of revocation does not apply, or is overcome and is rebutted, where it appears that the will was deposited by the deceased with a custodian and that the deceased did not thereafter have it in her possession or have access to it. (*Schultz* v. *Schultz,* 35 N. Y. 653 [91 Am. Dec. 88]; *In re Colbert,* 31 Mont. 461 [107 Am. St. Rep. 439 [3 Ann. Cas. 952, 78 Pac. 971, 80 Pac. 248]; see, also, R. C. L. 385, and 50 L. R. A. (N. S.) 865.) But if the opinion in that case be deemed to hold that when the facts which raise the presumption of revocation are shown such presumption is met and rebutted by the presumption of continuing existence, as announced in subdivision 32 of section 1963, or that the latter presumption, coupled with proof of the existence of the will at some time prior to death, supplies the proof of the existence of the will at the time of death, as required by said section 1339, we are not in accord with that conclusion and the case is overruled to that extent. The Sweetman case was decided by a divided court, and the dissenting opinion serves to accentuate the importance of applying the presumption of revocation when the facts, as in this case, call for its

operation, regardless of the presumption of continuing existence. [4] Where the special presumption of revocation is applicable to the facts it must therefore be held that it is not rebutted or overthrown by the application of the general presumption embodied in subdivision 32 of said section 1963. In the case of *Matter of Kennedy*, 167 N. Y. 163 [60 N. E. 442], a similar question with reference to the proof required to establish a lost or destroyed will was involved, and the court said: "It is urged that in such cases the law presumes that a fact continuous in its character continues to exist until the contrary is proved, and that there is a presumption that an instrument shown to have been executed continues in existence. This rule, however, has no application to an ambulatory instrument like a will or codicil. Indeed, as to such an instrument the presumption is the other way." If the rule were otherwise all that would be necessary in order to prove a lost or destroyed will would be to show that the will was in the possession of the testatrix some time, any time, prior to her death, with no apparent intervening cause for destruction or revocation, and thus rebut the presumption of revocation and entirely nullify the requirements of said section 1339.

In further justification of the finding that the will of Bettie Ross was in existence at the time of her death, but was destroyed after her death, the proponent at length discusses the facts and circumstances shown in evidence with reference to the disposition of the jewelry and valuable papers of the deceased on the morning of the day of her death and thereafter. Certain acts and statements of Mrs. Alice Silverstine before and after the death of the deceased and of Mrs. Ella Taylor after the death are commented upon and thereon the proponent predicates a charge of conspiracy on the part of those two women to defraud the proponent out of that portion of the estate represented by the difference between what he would receive under the will and the one-fourth part thereof which he would receive as an heir at law of the deceased if it be declared that the deceased died intestate. Mrs. Silverstine and Mrs. Ross lived on adjoining properties. The relation between the two was that of friendly neighbors. Mrs. Ross had been ailing physically for some time before her death and Mrs. Silverstine had evidenced a kindly concern in her welfare. As

Mrs. Ross lived alone in her home it was arranged between the two women that when Mrs. Ross arose in the morning she would raise a window shade on the side of the house toward the Silverstine home. On the morning of June 18th the shade was not raised as usual, whereupon Mrs. Silverstine went to Mrs. Ross's back door, found it open, and entered. She then found Mrs. Ross in bed, in great pain. She called a doctor and an ambulance and had her taken to the hospital. In the meantime Mrs. Ross instructed Mrs. Silverstine to pack her grip in preparation for the trip to the hospital and asked her to hand to her the valuable papers and other effects which were in the sideboard drawer. Mrs. Silverstine did so, and Mrs. Ross in turn handed these effects back to Mrs. Silverstine with a request: "Mrs. Silverstine, will you take care of these for me?" She also requested Mrs. Silverstine to telegraph her sister, Ella Taylor, at Corvallis, Oregon, to come immediately. This was also done. Mrs. Silverstine made a list of the articles handed to her by Mrs. Ross for safekeeping. They consisted of jewelry, certificates of deposit and other papers, but the will, according to her testimony, was not contained therein. She consulted Mr. H. A. Blanchard, and on his advice placed all of these effects in a safe-deposit box in the Bank of San Jose. This was done before Mrs. Taylor arrived from Oregon, on June 20th. The proponent, who lived in San Francisco, was notified of the death on that day, and on the morning of the 21st met Mrs. Taylor at the Ross home, from which place they went to the undertaking parlors. On the evening of the 20th, in the office of Mr. Blanchard, Mrs. Taylor signed a petition for the issuance to her of letters of administration, but she said nothing to Mr. Gorman about that fact. Said petition was filed on the 21st, and on the afternoon of that day Mrs. Taylor left by train with the remains for Corvallis, Oregon, where the funeral and burial took place a few days later. Prior to her departure there was no extended conversation between herself and the proponent with reference to property matters, it being agreed between the two that such matters would be taken up on her early return from Oregon. On the morning of the 22d the proponent went to the office of Mr. Archer for consultation, and on the latter's advice entered the home place on Thirteenth Street to search for the will, but could not find it. A second search was made by him in the presence of a wit-

ness, with a like result. After learning of the filing of the petition for letters of administration by Mrs. Taylor the proponent on June 30th made an *ex parte* application for and received special letters of administration, which authorized him to collect all of the personal property of the estate upon the giving of a bond for $5,000. When Mrs. Taylor returned to San Jose she went to the home place on Thirteenth Street. She there found the proponent, who was engaged in packing up some articles belonging to deceased. An extended conversation took place between the two at that time, a portion of which is related by the proponent as follows: "She said what am I doing? I said 'I am packing these things up,' and the question arose 'Why?' I said 'Several different things have been missing around here and I am putting them in storage for safe-keeping.' For instance I told her three cut glass drinking glasses were gone, and the papers and the jewelry, and may be some cash that my aunt might have had in the house, little things, and she immediately accused me of saying she took them. I said 'No, aunty, I didn't tell you that.' I have a witness here to the effect that I didn't say anything like that. I said 'The reason I asked you if you knew anything about them is because possibly I thought you might have taken them back with you to Oregon for safe-keeping,' not the cut glasses. I was referring to the jewelry and the certificates. And she said 'No, I don't know anything about them.' I said 'Well, gosh, we will have to start a police investigation then.' She says 'I will soon find out where they are. May be Mrs. Silverstine knows.' And she went out of the house, out of the front door, to the side toward the back of Silverstine's house, and I followed, but just as we were near Silverstine's back steps she turned around real quick and said 'Marco, is there a will?' I said 'My attorneys are looking that up.' 'Now,' she said, 'I will tell you right now there is no will.' . . . Mrs. Taylor said she didn't know where the jewelry was. I went over to Mrs. Silverstine and found out for myself, Mrs. Taylor didn't tell me." It appeared in evidence that Mrs. Taylor knew at that time that Mrs. Silverstine had the valuables in safe-keeping. Mrs. Gorman testified that when the proponent and Mrs. Taylor proceeded to the house of Mrs. Silverstine on the occasion referred to in the foregoing she heard Mrs. Taylor say to Mrs. Silverstine "Don't say anything." It

would naturally be supposed from what had taken place before the proponent and Mrs. Taylor started to the Silverstine house that the relations between the two had become somewhat strained. But no confidential relation was shown and the evidence as related could not reasonably form the basis of a finding of fraud.

A few days after the foregoing occurrence the proponent and Mrs. Taylor were present at the bank when the safe-deposit box was opened and the valuables of the deceased removed therefrom in the presence of a representative from the county treasurer's office. An inventory of the property was taken at that time and the will was not found therein.

[5] It would unduly prolong this opinion to set forth all of the testimony relied upon by the proponent in support of his position. It is enough to say that the entire record, including the evidence, has been reviewed with care. From a consideration of the same in the light most favorable to the proponent we fail to find sufficient evidence upon which to justify the finding of fraud necessarily implied in the finding that the will was destroyed after the death of the deceased. [6] The rules of evidence and the weight to be accorded to the evidence are the same in this proceeding as in any other civil case. (*Estate of Caspar,* 172 Cal. 147 [155 Pac. 631].) [7] It is true that the trial court is the exclusive judge of the weight to be given to the evidence, but it is also true that the presumption is in favor of honesty and fair dealing (see *Estate of Sweetman, supra,* at p. 18), and the burden is upon the party asserting the fraud to prove it by some substantial evidence (12 Cal. Jur. 817). The facts and circumstances shown in evidence must have given rise at least to a reasonable inference of fraud, and not a mere suspicion thereof (*Roberts* v. *Burr,* 135 Cal. 156 [67 Pac. 46]). Indeed, it has been held that "if there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of court or jury to draw the inference favorable to fair dealing." (*Ryder* v. *Bamberger,* 172 Cal. 791 [158 Pac. 753].) It is urged that it is the province of the trial court to draw these inferences, and such is the law, but as a necessary prerequisite there must be facts and circumstances in evidence from which inferences

of fraud may reasonably be drawn. We do not find them in the record.

There is much argument in the briefs of proponent dealing with the alleged impeachment of the testimony of Mrs. Silverstine. The evidence in that behalf came almost wholly from the lips of a detective and his wife who were housed by the proponent in the Ross home on Thirteenth Street for almost a month for the express purpose of trapping Mrs. Silverstine. Conceding that the evidence of these detectives was worthy of full credit, the impeachment alleged to have resulted therefrom appears to have been on matters wholly collateral to the main issue.

There is also much argument by proponent relating to the reasons why the deceased may have desired to bestow her bounty upon the beneficiaries named in the will and in the particular manner therein provided. Discussion of the evidence in that respect would be futile, as it is not deemed of determinative value.

By reason of our conclusion as to the principal contention of the contestant it is unnecessary to discuss the many other points raised on the appeal.

The order is reversed.

Richards, J., Waste, C. J., Curtis, J., Finlayson, J., and Seawell, J., concurred.