[S. F. No. 9046. In Bank.—February 4, 1921.]

In the Matter of the Estate of DELIA M. SWEETMAN, Deceased. W. D. GRIFFITHS et al., Appellants, v. WALTER S. JOHNSON, Respondent.

**[1]** ESTATES OF DECEASED PERSONS — LOST WILL — POSSESSION OF TESTATOR—PRESUMPTION OF DESTRUCTION.—A will last seen and known to have been in the possession of the decedent, which cannot be found after his death, will be presumed to have been destroyed by him and with an intention of revoking it, since the law always presumes in favor of the innocence of an act, and any other inference would involve a finding of a wrongful or fraudulent destruction of the will by a third person.

**[2]** ID.—DECLARATIONS OF TESTATRIX — REBUTTAL OF PRESUMPTION.— The presumption that a will last seen in the possession of the testatrix two and a half months previous to her death and which could not be found after her death has been destroyed by her with intent to revoke it is overcome by declarations of the testatrix made a few days before her death that the will was in existence.

---

2. Necessity and sufficiency of proof to account for nonproduction of will upon application to probate it as a lost or destroyed will, note, 50 L. R. A. (N. S.) 861.

Evidence to establish lost or destroyed wills generally, note, 38 L. R. A. 433.

[3] ID.—CONTINUED EXISTENCE OF WILL—PRESUMPTION.—In view of subdivision 32 of section 1963 of the Code of Civil Procedure, a will which was in existence seventy-five days before the death of the testatrix will be presumed to be in existence at the time of her death.

APPEAL from an order of the Superior Court of Alameda County admitting a will to probate as a lost or destroyed will. William S. Wells, Judge. Affirmed.

The facts are stated in the opinion of the court.

F. A. Berlin for Appellants.

Decoto & Calkins for Respondent.

WILBUR, J.—This is an appeal from an order admitting a will of Delia M. Sweetman, deceased, to probate, as a lost or destroyed will. The main question at issue in the case is whether or not the will was in existence at the time of the death of the testatrix. The will was last seen in the possession of the testatrix in November, 1916, two and a half months previous to her death. The proponent of the will relies upon declarations made by the testatrix during that period to establish its continued existence, to overcome the presumption of its destruction with intent to revoke, arising from the possession of the will by the testatrix and the inability to find it after her death. [1] The rule is thus stated in the Encyclopedia of Evidence: "A will last seen and known to have been in the possession of the decedent, which cannot be found after his death, will be presumed to have been destroyed by him and with an intention of revoking it, since the law always presumes in favor of the innocence of an act, and any other inference would involve a finding of a wrongful or fraudulent destruction of the will by a third person" (14 Ency. of Evidence, 440; see, also, *Matter of Cunnion,* 201 N. Y. 123, 126, [Ann. Cas. 1912A, 834, 94 N. E. 648]; *In re Keene's Estate,* 189 Mich. 97, [Ann. Cas. 1918E, 367, 155 N. W. 514]; *In re Miller's Will,* 49 Or. 452, [124 Am. St. Rep. 1051, 14 Ann. Cas. 277, 90 Pac. 1002, 1004]; *Rape* v. *Cochran* (Tex. Civ. App.), 217 S. W. 250, 40 Cyc. 1281). The admissibility of such testimony is conceded by both parties, for each relies in part upon her

declarations to support their respective claims. The proponent of the lost or destroyed will, which we will hereafter call the Johnson will, sought to prove that the will had been destroyed after the death of the testatrix by F. A. Berlin, the attorney who proposed an earlier will of testatrix for probate, which we will hereafter refer to as the Berlin will. The latter contended that all the evidence with relation to the execution and existence of the Johnson will is a pure fabrication. The trial court found that the Johnson will was properly executed and that it continued in existence up to the time of the death of the testatrix, and that it revoked the Berlin will by implication, as it disposed of all the property of testatrix. The court also found that F. A. Berlin did not destroy the Johnson will after the death of the testatrix. The court also specifically found that the allegation of the proponent of the Johnson will that the Johnson will was destroyed by a person or persons unknown to the Johnsons prior to the death of the testatrix was not true. There is no dispute as to the execution of the Berlin will and it is conceded that the will produced in court was executed by the testatrix, but it was denied probate because not her last will. The Berlin will was executed on the tenth day of May, 1915. It was drawn by Mr. F. A. Berlin, who for some twenty years had been the attorney for, and employer of, the husband of the testatrix. By the terms of this will all the property of the deceased was left to her husband with the exception of a set of mahogany furniture, which was bequeathed to Mr. Berlin. The husband was named as the executor thereof.

According to the testimony offered in behalf of the proponent of the Johnson will, the decedent came to the office of Walter S. Johnson, an attorney, ten days later and requested that he draw a will for her. This he did and by the terms of this will, as first drawn, all of the property of the decedent was given to Mr. Johnson, his brother and sisters, and they were charged with the obligation of supporting the husband of the testatrix during his life. Five or six days later this draft was superseded by another, whereby the husband was given a life estate and Mr. Johnson, his brother and sisters were given the remainder of the entire property, subject to that life estate. Walter S. Johnson was made the executor. This will was executed by the testatrix August 9,

1915. The testatrix, however, instead of destroying the Berlin will, kept the two wills together underneath a drawer in one of the upstairs rooms of her home, where they were frequently seen together. In June, 1916, the Johnsons moved into the home of the deceased and remained there until the latter part of November, 1916. Mrs. Sweetman was asked why she kept the Berlin will and she stated it was because she had therein bequeathed the set of mahogany furniture to Mr. Berlin, which she wanted him to have. The Johnson will was last seen by Walter S. Johnson, together with the Berlin will, in the upstairs room, on the floor where they had apparently dropped from underneath the drawer. Without calling the attention of the testatrix to the fact that the wills were out on the floor, he suggested to her that they ought to be put in a safe place. The testatrix promised him that she would place them with Mr. Green, of the Oakland Savings Bank, where she had an account. Instead of this, however, and without the knowledge of any of the Johnsons, Mrs. Sweetman delivered a small package to her friend, Mrs. Kammer, with the request that it be placed in the safe in a butcher-shop in Oakland. This was done and subsequently, at the request of Mrs. Sweetman, the package was returned to her for her inspection. After examining them she returned the package to Mrs. Kammer to be replaced in the safe. There they remained until the day of her death, when Mrs. Kammer, acting under the previous directions given her by the testatrix, got the package and delivered it to Mr. Berlin, who opened it in the presence of his wife and, as they testified, found only the Berlin will.

The Declarations of the Deceased.

There are two distinct lines of opposing declarations introduced in evidence; those introduced on behalf of the proponents of the Johnson will are to the effect that at numerous times during the two and a half months before her death Mrs. Sweetman stated that the will was still in existence and acceptable to her, while the testimony on behalf of the proponents of the Berlin will was that she had stated that she had destroyed the will purposely; that she did not desire the Johnsons to have any of her property; and that she had intentionally deceived them into believing that the will was still in existence.

The exact nature of the declarations will more clearly appear from the following statement of the evidence:

Walter S. Johnson testified that two or three days before her death he told the testatrix that he had asked Mr. Green at the Oakland Bank of Savings if he had the will and that Mr. Green said he did not have it; that the will was not upstairs; that he asked her where it was and she, after thinking quite a while, said, "Then you go see Mr. Berlin about it." That after that he had several conversations with Mrs. Sweetman about it; that "she said something about to keep on looking for the will, that I would find it. She said that I would find it all right. I think she told me twice to ask Mr. Berlin about it, and I did finally go down and ask Mr. Berlin about the wills"; that at another time she stated to him, " 'Now, you have no fear about that will, you will find the will all right.' She rather laughed at my even questioning its whereabouts—'it will be handed to you. If anything happens to me it will be handed to you immediately.' She said I didn't need to have any fear about the will; that as soon as she got well she would get it and she would show it to me, and then she was going to put it away again." This was three days before her death.

On that day, according to the testimony of Mrs. Brooks, the mother-in-law of Mr. Johnson, the decedent was questioned as follows: "Q. I suppose you want Mr. Berlin to have that set of furniture. She said, 'Yes,' she says, 'That will is with the other one,' She says, 'They are both together, Sam.' " Mrs. Brooks also testified as follows: "We asked her one day if she felt able to sign a copy of that original will, so that my son might have something to show in court, she said, 'No,' that she didn't think she felt able, thought it wouldn't be right, and 'it is not necessary.' At that time she knew that we were not able to find the will, but she did not consider that it was lost. She did not tell us where it was." This also occurred only a few days before her death. She further testified to a conversation with the testatrix three days before her death, as follows: "I told her that he was unable to find the will which she had given him, and we spoke of that several times, and she said—my son had told her that he was unable to find this will and that they had an understanding about it, and I asked her about it and she told me very explicitly that—she said, 'Just

as sure as I am lying here, and just as sure as I hope to be in Heaven, Sam will have that will at the proper time.' She said, 'I don't give one anxious thought, and I don't want Sam to.' " In answer to the following questions this witness gave the following answers: "Q. What did she say on this last occasion that you were speaking of the will? A. Well, she said this that I have just repeated to you, that 'Sam will find the will or it will be handed to him at the proper time, and I do not give it one anxious thought, and I don't want him to.' . . . Q. Did she ever say anything about looking for the will? A. The last thing she said to me that was intelligible—her articulation was very poor—was, 'Mrs. Brooks, never give up about that will; search for it, never give up.' "

Pete Balengat, a witness for appellant, testified that the day before the death of Mrs. Sweetman he asked if her affairs were in shape and she replied that they were, "that everything was all right. She said that she had some wills and that they were in the safe. She didn't say what safe. She said all she wanted done would be in some safe; I don't know where. She never mentioned the place."

Cornelia C. Gruenhagen, a sister of Mr. Johnson, a legatee under the will, testified as follows: "She never told me where the wills were. I asked her on her deathbed. I had never worried about the will, but when I found nobody could find out where the will was—she had great confidence in me, and I asked her where the will was, and she said, 'Why, it is all right; it is all right. What's all this fuss about?' I didn't probe it because she was very ill, and I didn't like to. That is all I ever talked to her about the wills. She never told me where the will was, neither of them."

On the other hand, the nurse who attended Mrs. Sweetman during her last illness, Mrs. Martha Bergendahl, testified for appellant that on the Wednesday before her death (the very day of one of the conversations testified to by Mrs. Brooks, the mother-in-law of Walter Johnson), the deceased said to her, " 'They think they are smart' [referring to the Johnson children], 'but I will fool them.' She said this several times in the last week before she passed away. . . . She said she had destroyed all wills except one man that had a will that was high up in office. That was her last statement she gave to me. . . . She said she had destroyed the Johnson will,

burned it. She did not want them to get anything, she said. She told me that Wednesday before she passed away at night, the last time she told me.'' She further testified that, in the presence of Pete Balengat, decedent stated that the Johnson will had been destroyed. That witness, however, stated he did not hear her say anything about burning up any will. On cross-examination, however, he testified: ''She said straight that she was not going to leave her property to the Johnsons. She says, 'They think they are smart, but I will fool them.' ''

Daisy A. Adams testified that in January, 1917, Mrs. Sweetman told her that she did not want the Johnsons to have anything and that she had burned up everything, all the papers.

Annie Ayhens testified that Mrs. Sweetman, two weeks before she died, told her that she was going to send for Mr. Berlin to have him make her will. Another witness named Kelly testified that testatrix said shortly before her death that she was going to make a new will and drop the Johnsons out, about two weeks before her death.

Mrs. Kammer also testified that arrangements were being secretly made by Mrs. Sweetman to have Mr. Berlin come on Monday, January 29, 1917, to draw a new will for the deceased, who died Saturday, February 3, 1917. Mr. Sweetman had predeceased her in June, 1916.

If the foregoing declarations of the deceased were established by competent testimony, the problem presented for consideration would be quite different from the one that confronts us, for we must assume that the trial judge disbelieved the testimony hostile to the Johnson will. We have, therefore, the simple question as to whether or not the declarations of the deceased that the will was in existence, repeated in the most solemn fashion only three days before her death, was sufficient to support the finding of the trial court that the will was in existence at the time of her death.

[2] It seems clear that these declarations of the testatrix at least had the effect of overcoming the presumption that the will had been destroyed by her with the intention of revoking the same.

With this presumption thus eliminated we have, then, the fact that the will was in existence two and a half months before her death.

The law presumes that a thing once shown to be in existence continues in existence as long as things of that nature usually exist (Code Civ. Proc., sec. 1963, subd. 32).

[3] If we apply that presumption to the will under consideration, it is evident that without the intervention of some unusual agency it would not cease to exist in seventy-five days.. There was no proof that any such agency destroyed the will. The trial court was therefore justified in its finding to that effect.

Order affirmed.

Sloane, J., Shaw, J., and Lennon, J., concurred.

OLNEY, J., Dissenting.—I dissent. The code provides that no will shall be proved as a lost or destroyed will unless either (1) "the same is proved to have been in existence at the time of the death of the testator" or (2) is shown to have been destroyed in his lifetime fraudulently or by public calamity. (Code Civ. Proc., sec. 1339.) The findings of the trial court negative the second alternative. The probate of the will in this case therefore depended on its being proved that it was in existence at the time of the testatrix's death. No one was produced who saw the will at or after her death. It had, in fact, disappeared some time before, and had been searched for and not found. Its disappearance is in no way accounted for. It was attempted to account for it by the contention that one Berlin destroyed it, but this contention the trial court expressly finds against. The only testimony relied upon to show its existence at the testatrix's death was testimony of declarations by her, from which the inference might be drawn that she believed it to be still in existence. How declarations of this character can be taken as proof that it was in existence some days later, when she died, I am wholly unable to see. They do not even show that it was in existence when they were made. They were not declarations that she had the will, or knew its whereabouts, or knew that it was still in existence, but were merely expressions of a belief that it would be found if searched for. Why she so believed does not appear. She may have had good reasons or she may not. The facts that do appear are that the will had disappeared some months before the testatrix's death, and was not seen thereafter, so far as shown, either by the tes-

tatrix or anybody else, although its disappearance was rather persistently brought to the testatrix's attention, and she urged searching for it, which was done without avail. Yet, although these are all the real facts shown, except such as are negatived by the court's other findings, it is held that they are sufficient to meet the requirement of the code that it affirmatively appear that the will was in existence when the testatrix died. To my mind, if there is any inference what· ever to be drawn from them, it is just the contrary.

The reasoning of the main opinion is that it having been shown that the will was in existence some time before the death of the testatrix, the presumption operates that a thing once shown to exist continues in existence as long as things of that nature usually do. But the very purpose of the requirement of the statute that proof be made of the existence of the will "at the time of the death of the testator" is not to permit the presumption to operate, to make it impossible to probate an unproduced will by proof that it was in existence prior to the testator's death eked out by any presumption that it continued to exist until he died. If it can reasonably be inferred from the facts in evidence that it was in existence when the testator died, that is another matter, and quite different from presuming, as a matter of law, that it was then in existence because it was shown to have once existed. In this case no such inference from the facts in evidence can reasonably be drawn.

The opinion also goes on the proposition that the declarations of the testatrix show that the will was not destroyed by her *animo revocandi*. But suppose they do, what difference does it make? The fact still remains that the will disappeared two and one-half months before the testatrix's death and was not seen afterward. The opinion seems to be based upon the assumption that, unless the will was destroyed *animo revocandi*, it would still operate. This is not the law. It must be in existence at the time of the testator's death, that is, must not have been destroyed, except where it was destroyed fraudulently or by public calamity. That is the explicit requirement of the statute. If the will were destroyed by the testatrix ignorantly or accidentally, or by someone else, but without fraudulent intent, it was not only destroyed physically but legally as well. The requirement is that it be in existence when she dies, and that that fact

be affirmatively proven.  Is it a sufficient compliance with this requirement that it be proven that she once made a will, that it disappeared some months before she died, but that she did not destroy it *animo revocandi*, and believed that it would be found?  Yet, when the evidence is examined that, and only that, is the proof in this case.

It should, perhaps, be observed that in many jurisdictions the question presented in case of an attempt to probate a lost will or destroyed will, which is shown to have once existed, is purely a question as to its revocation by the testator. The presumption from its disappearance is that it was revoked, and this presumption must be overcome.  Proof that the will was in existence after his death goes, of course, directly to show that it was not revoked, and this is the point of such evidence in those jurisdictions.  On the other hand, it is not material that the will was not in existence when the testator died, provided it appear that it was not destroyed by him for the purpose of revoking it, or that he did not know of its destruction in some other manner and acquiesce, as it were.  But this is not the rule under our statute.  Proof of nonrevocation is not sufficient.  The proof must be that the will was in existence when the testator died, or else that it was destroyed fraudulently or by public calamity.  This appears not only from the language of the statute but from our decisions.  (*Estate of Johnson*, 134 Cal. 662, [66 Pac. 847]; *Estate of Patterson*, 155 Cal. 626, [132 Am. St. Rep. 116, 18 Ann. Cas. 625, 26 L. R. A. (N. S.) 654, 102 Pac. 941].)  It may be that the declarations of the testatrix in this case were sufficient, if the evidence for the proponents alone be believed, to show that the will was never revoked.  But that they were sufficient to show that the will was in existence when the declarant later died is a very different thing.

Angellotti, C. J., and Lawlor, J., concurred.